H. Robert Herman, J.
This is a motion by the defendant corporation to dismiss the accusatory instrument which alleges that on December 9, 1973 the defendant violated article 2 of the General Business Law (the Blue Law).
Originally the motion to dismiss was presented on several grounds, including that of alleged discriminatory enforcement. Concurrently a large number of similar cases, involving many different defendants, as well as Wegman’s Food Markets, Inc. (hereinafter referred as Wegman’s), were also pending within the County of Monroe.
In order to avoid a multiplicity of similar hearings in the various local criminal courts within the County of Monroe, the attorneys for the various defendants and the District Attorney of the County of Monroe entered into a stipulation that one case would be chosen to determine the issue of alleged discriminatory enforcement, and that, on that issue alone, the determination of the motion to dismiss in this case would be binding on that issue in all of the other pending so-called “ Blue Law ’ ’ cases.
With this understanding, the court directed a hearing to be held pursuant to the procedure suggested by People v. Utica Daw’s Drug Co. (16 A D 2d 12). The proof was taken in a series of six sessions between September 12, 1974 and October 23, 1974. After a period to allow for the submission of memoranda, the matter was finally submitted on November 21, 1974.
Since the sole issue herein is the question of discriminatory enforcement, the court, will not deal herein with issues of the constitutionality of the statute itself, 'the sufficiency of the *90 accusatory instrument, or any other grounds upon which the original motion was based.
The essential facts were found to be as follows:
On Sunday, December 9, 1973, Arthur Press, an employee of McCurdy & Company, purchased items at defendant Wegman’s ‘1 supermarket ’ ’ on Penfield Road near Nine Mile Point Road in the Town of Penfield. For the purpose of this motion the defendant concedes that it violated article 2 of the General Business Law.
Evidence was given that with respect to three Sundays in December, 1973 — the 9th, 16th, and 23d- — -a large number of other stores of significant size and variety were open and offering for sale and selling a wide variety of items in violation of article 2 of the General Business Law. It was clear that among the “ supermarkets ” in Monroe County fully open for business on those dates were: at least 5 of the 13 Loblaw’s stores, 5 stares of Acme Markets, 29 .stores of Star Markets, some A. & P. stores, Agostinelli’s, Super Saver, -Super Duper, Big M, as well as the 22 Wegman’s stores. Of these, the proof indicated, only Wegman’s was charged with violations, and, regarding Wegman’s, a total of nine charges were filed relative to the aforesaid three->Sunday period. It is significant to note that no complaints were filed against the competitors in the vicinity of the Wegman’s stores against which complaints were filed.
In addition, it was clear that a large number of nons-upermarket, nonfood stores were in operation in a manner violative of article 2 of the General Business Law over the same three-Sunday period. These included, among others: Key Drugs, Dox Drugs, Daw’s Rite-Aid Drugs, Tapps, W. T. Grant, Two Guys, J. B. Hunter, Big N. and J. M. Fields.
It is thus clear that a large number of food markets, drug stores, and discount department stores were openly operating in violation of article 2 of the General Business Law on these same three Sundays in December, 1973. It is also clear that, of the large number of food “ markets ” or “ supermarkets ” which were in violation during said period, Wegman’s was the only food market or supermarket against whom an accusatory instrument was filed. In fact, nine separate accusatory instruments were filed against Wegman’s during said period.
However, in addition to the nine charges filed against Wegman’s with respect to said three-Sunday period, a total of 26 charges were filed against a number of nonfood or nonsupermarket stores including several drug stores, and discount depart *91 ment stores: Fay Drugs (.2), Key Drug (5), Daw’s Rite-Aid (3), J. B. Hunter (7), W. T. Grant (6), and Big N (3).
The stated policy of the office of1 the Monroe County District Attorney during this period was that 'his office would not initiate any complaints, hut that it would prosecute all cases in which complaints had been filed. It was his testimony that in prior years, citizens had protested his office’s involvement, as well as law enforcement officer involvement, in the initiation of this form of complaint on the ground that, as a matter of priority, they had more important things to do. For this reason, among others, the District Attorney set a .policy relative to article 2 of the General Business Law, to which he clearly adhered, of responding to filed complaints, but not becoming involved in the initiation of complaints except to explain the procedure to someone making inquiry.
The representatives of a number of merchants who sought and favored enforcement of article 2 of the General Business Law met together a number of times in the fall of 1973 to determine a plan or strategy regarding the 11 Blue Laws ”. Senior officers of McCurdy & Co. and Sibley’s (both major local department stores with plaz'a branches) plus representatives of a number of1 other local merchants were involved. These constituted a segment of the local Retail Merchants’ Council. At the request of the merchants, the District Attorney attended two of these meetings and the County Manager attended one.
It was also noted that the bulk of concern with respect to this problem occurred shortly prior to the Christmas holiday selling period and that this pattern had been true over a period of several years. Evidence was presented to show that McCurdy & Co., far example, had a total of 10.7% of its 1972 business in November and 16.9% in December. In 1973, these figures were 10.3% and 16.5% respectively.
In addition, there was evidence that many intraorganizational •meetings occurred out of which evolved programs in which individual employee's, acting as “buyers”, “shopped” stores which were open on Sundays and in violation of the “ Sunday Sales Law”. In many instances these “buyers” filed complaints with various courts; in other instances, they did not. In many instances, the merchants provided funds' or reimbursed amounts advanced for these “ purchases ”, It was stated that participation in this program was voluntary, although some employer-employee pressure was apparent.
The expressed primary motivations for this activity ranged from expressions that employees feared that more stores would *92 begin to open on Sunday thus requiring them to work on Sunday, to a desire that everyone should be obeying the law rather than just some. In addition, a review of the evidence as a whole indicates that there was significant economic motivation and that economics was a significant motivating factor for the activities of those merchants and their agents who were distressed by the “ Sunday 'selling” by other merchants. This is not stated as criticism, but merely as a finding of fact.
After reviewing all of the facts derived from the hearing the court turns to the questions of law. The basic test to be applied was stated in Yick Wo v. Hopkins (118 U. S. 356, 373-374): “ Though the l'aw itself be fair on its face and impartial in appearance, yet if it is applied and administered by public authority with -an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons in .similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution ”.
There has been sufficient participation by public authority in this process to bring the matter within the purview of a question of the denial of the equal protection of the law potentially in violation of 'the defendant’s constitutional rights (U. S. Const., 14th Amdt.; N. Y. Const., art. I, § 11), if there has been, in fact a discriminatory enforcement of the law. Although it 'has been held on the theory of agency (People v. Paine Drug Co., 22 A D 2d 156, 159) that “ public authorities ” may not be chargeable with the discriminatory design of a group of merchants, “ the question is whether the state involvement that is undeniably present is involvement of a kind and extent that is ‘ significant ’ in terms of present-day state action doctrine.” (Seidenberg v. McSorleys’ Old Ale House, 317 F. Supp. 593, 604.) The use of State courts to enforce purely private easements by owners of land prohibiting Black occupancy has been held to constitute State action (Shelley v. Kraemer, 334 U. S. 1).
There is no ‘ ‘ infallible test for determining whether the State, ‘ in any of its manifestations ’ has become significantly involved in private discriminations. ‘ Only by sifting facts and weighing circumstances'’ on a case-by-oase basis can a ‘ nonobvious involvement of the Sítate in private conduct be attributed its true significance’” (Reitman v. Mulkey, 387 U. S. 369, 378, citing Burton v. Wilmington Parking Auth., 365 U. S. 715, 722).
The complaint, once made, involves the prosecution by the District Attorney in the name of the People of the State of New York, in the courts which constitute a portion of the judi *93 cial system of the State of New York. Elements of discretion, both with respect to recommendation and disposition, are de facto involved. There is a significant £ £ state impact ’ ’ in the potential carrying through of a discriminatory design of a private party, if in fact such a design exists, where the office of the District Attorney has been made available to all complainants, and thereafter, the courts are likewise available. The State thus becomes significantly involved (Reitman v. Mulkey, 387 U. S. 369, supra). This is true even if the District Attorney takes no action as an initiator and adopts as his own policy one which is even handed and nondiscriminatory a:s is so in the case at hand.
The evidence on its face appears to show no pattern of discrimination with respect to the initiation of complaints by the various witnesses and others. Concern by employees with possibly being required to work on Sunday, if their employers should feel compelled to open on Sunday to meet competition from other merchants remaining open on Sunday and violating article 2 of the General Business Law, and general concern that existing laws should be enforced, seem to be the primary reasons given for their filing complaints.
We must also look, however, to the circumstantial evidence and the statistical data. ££ Statistical evidence in conjunction with other factors, although not shown to be discriminatory in form or intent, may constitute, under some circumstances evidence of discriminatory practice.” (State Div. of Human Rights v. Kilian Mfg. Corp., 35 N Y 2d 201.)
Out of the 35 pending charges alleging violations of article 2 of the General Business Law, 9 are against the defendant, Wegman’s. Of the 7 defendants in said oases, only Wegman’is is a food store or £ £ supermarket ”; although a large number of competitor ‘ ‘ supermarkets ’ ’ were open and -operating on the same Sundays and many were located in close proximity to the Wegman’s markets, and were violating 'article 2 of the General Business Law.
It is the defendant’s contention that Wegman’s was singled out in a discriminatory fashion. B-ut, selective enforcement alone has been held not to violate a defendant’s right to equal protection under the law. (People v. Utica Daw’s Drug Co., 16 A D 2d 12, 21, supra.) ££ It is only when the selective enforcement is designed to discriminate against the persons prosecuted, without any intention to follow it up by general enforcement against -others, that a constitutional violation may be found.” (People v. Utica Daw’s Drug Co., supra, p. 21.)
*94 A review of all of the evidence, direct and circumstantial, may well have led this court to make a finding of discriminatory enforcement in this case if the burden of proof required were upon the People and if. that burden were required to be proven beyond a reasonable doubt. This, however, is not the rule. ‘ ‘ A heavy burden rests on the defendant to establish conscious, intentional discrimination, but if it succeeds in sustaining that burden, the defendant will be entitled to a dismissal of the prosecution as a matter of law ”. (People v. Utica Daw’s Drug Co., supra, p. 19.)
With this in mind, the defendant was one of seven defendants. Three were drug stores, two were so-called chain discount department stores, and one, the defendant, was a “ supermarket ”. The complaints covered' a period of three consecutive Sundays. The motivation of the complainants appeared to he a blend of altruism, practicality and economics. After reviewing the facts as a whole, the court concludes that the defendant has not met the heavy burden of proof necessary to show such conscious, intentional discrimination. The motion of the defendant is therefore denied.
While the decision of the court has been made with respect to the motion at hand, the court feels compelled to express some views regarding some of the serious problems which exist in connection with the enforcement of article 2 of the General Business Law.
The role of1 a court is not to legislate, but to interpret and apply the law as it has been created by the legislative branch of the government, whether the court agrees or disagrees with the legislation itself. Through this method alone can we maintain that most important separation of powers found within our Constitution. “ The argument for change is to be addressed to the Legislature, not to the courts.” (People v. Kupprat, 6 N Y 2d 88, 90; People v. L. A. Witherill, Inc., 29 N Y 2d 446, 449.) The judiciary still may have a duty to call to the attention of both the people of the community and' the Legislature the fact that a particular piece of legislation, again and again, reveals itself to be replete with practical problems of enforcement and interpretation.
Some of the particular problems which exist with respect to article 2 of the General Business Law are as follows:
1. There is a marked divergence of opinion among people as to whether any restriction on Sunday selling should exist at all. This is argued both on the basis of religious freedom, general freedom of choice, and on the basis of a free enterprise system. *95 Others argue the necessity of one general day of rest in a complex society. The choice rests with the Legislature.
2. The punishment for a violation of section 4 of the General Business Law, of a fine of not less than $5 and not more than $10 for a first offense, and not less than $10 nor more than $20 when the defendant shall have previously been convicted, is not much of a deterrent to a reasonably substantial merchant defendant, corporate or individual.
3. The forfeiture remedies created by section 12 of the General Business Law are:
a. So potentially drastic that they are seldom, if ever, invoked.
b. So proeedurally confusing and incomplete to deter its imposition: For example,
(1) Does this section mean that the forfeiture can only occur after conviction?
(2) If not after conviction, can it lawfully be made before there has been a judicial determination of the violation?
(3) If after conviction, must the items to be seized be the very same items viewed at the time of the alleged violation?
c. So confusing that any attempt at utilizing section 12 would probably lead to a plethora of subsequent litigation.
4. When an individual is charged as well as, or in lieu of, a corporate defendant that individual may face possible imprisonment in a county jail of up to 20 days under some circumstances, and up to five days even for a first offense. As this statute is drawn, some employees are faced with the alternative of possible imprisonment, or losing their jobs 'by refusing to work when that work involves a “ Blue Law ” violation.
5. The exceptions to the statute found in section 9 of the General Business Law appear to be often arbitrary and illogical as well as impractical. For example, in certain instances “ prepared” foods may be sold, but not nonprepared foods. This might permit the sale of a bologna, but not of an uncooked beefsteak. Drugs may be sold. Would this permit the sale of a medicated shampoo, but not a nonmedioated shampoo in a drug store? One could go on and on.
The court expresses no opinion about whether there should be prohibitions concerning Sunday or Sabbath activities. It urges however, that the Legislature once more review article 2 of the General Business Law and, if it believes that it should be abolished in its entirety, it should do so. In the event that *96 the Legislature believes that prohibitions of this nature should be retained, then it is respectfully recommended that .the statute be amended to provide for meaningful practical sanctions and clearer classifications of exceptions, if 'any. Consideration should also be given to removing this area of legislation from the criminal law and providing for civil remedies, possibly involving injunctive relief. In any event this is a body of law that cries out for reform.